UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

No. 09-2160-WCT

UNITED STATES OF AMERICA

vs.

FERNANDO LEAL-PARRA,
REINALDO LOPEZ, OSNIEL RIVERO,
JAVIER RODRIGUEZ, and LUIS ROMERO,

    Defendants.
_____/

## CRIMINAL COVER SHEET

1.  Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to October 14, 2003?   _____ Yes   __x__ No

2.  Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to September 1, 2007?   _____ Yes   __x__ No


Respectfully Submitted,

R. ALEXANDER ACOSTA
UNITED STATES ATTORNEY

By: _____
Dustin M. Davis
Assistant United States Attorney
Court No. A5501193
99 Northeast 4th Street, Suite 700
Miami, Florida 33132
(305) 961-9098
Dustin.Davis@usdoj.gov

# United States District Court

_____ SOUTHERN _____ DISTRICT OF _____ FLORIDA _____

UNITED STATES OF AMERICA

V.

FERNANDO LEAL-PARRA,
REINALDO LOPEZ, OSNIEL RIVERO,
JAVIER RODRIGUEZ, and LUIS ROMERO

**CRIMINAL COMPLAINT**

CASE NUMBER: 09-2160-WCT

I, the undersigned complainant, being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about December 30, 2008, through on or about February 6, 2009, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendants FERNANDO LEAL-PARRA, REINALDO LOPEZ, OSNIEL RIVERO, JAVIER RODRIGUEZ, and LUIS ROMERO did knowingly and intentionally conspire to possess with the intent to distribute a controlled substance, that is, a mixture and substance containing 5 kilograms or more of cocaine, in violation of Title 21, United States Code, Section 841(a)(1), all in violation of Title 21, United States Code, Section 846; did knowingly and intentionally conspire to obstruct, delay or affect interstate commerce or the movement of any article or commodity in commerce, by robbery, in violation of Title 18, United States Code, Section 1951(a), and did knowingly and intentionally possess a firearm in furtherance of a drug trafficking crime and/or a crime of violence, in violation of Title 18, United States Code, Section 924(c)(1)(A).

I further state that I am a Miami-Dade Police Department Detective assigned to a Federal ATF/HIDTA Task Force and that this complaint is based on the following facts:

**SEE ATTACHED AFFIDAVIT**

_____
VIRGILIO VALDES, DETECTIVE
MIAMI-DADE POLICE DEPARTMENT
ATF/HIDTA TASK FORCE

Sworn to before me, and subscribed in my presence,

FEBRUARY 7, 2009                                    at   Miami, Florida
Date                                                     City and State

WILLIAM C. TURNOFF
UNITED STATES MAGISTRATE JUDGE
Name and Title of Judicial Officer                       Signature of Judicial Officer

# AFFIDAVIT

Your affiant, Virgilio Valdes, being duly sworn, deposes and states:

1. I am a detective with the Miami Dade Police Department (hereinafter M.D.P.D) and have been so employed for fourteen years. I am currently assigned to a Federal ATF/HIDTA Task Force. As part of my duties, I am responsible for the investigation of violations of State and local narcotics and firearm laws, as well as violations of Title 18, United States Code, Section 924(c)(1), and Title 21, United States Code, Sections 841 and 846. In the course of my duties as a detective with M.D.P.D., I participated in the investigation and subsequent arrests of the defendants named in this complaint. The facts in this affidavit are offered only to establish probable cause and are not intended to be a complete recitation of the relevant facts.

2. Prior to December 30, 2008, your affiant had received information from a confidential source (CS) that an individual known as Fernando LEAL-PARRA was involved in home invasion robberies and other illegal activities. The CS further informed your affiant that LEAL-PARRA was interested in committing a narcotics related armed robbery.

3. On December 30, 2008, at approximately 3:46 pm, the CS introduced LEAL-PARRA to an M.D.P.D. undercover detective (UC) in a parking lot in Miami-Dade County, Florida, with the purpose of discussing an armed home invasion. During this audio recorded meeting, the UC portrayed himself as a disgruntled drug courier employed by a large-scale narcotics trafficker and expressed dissatisfaction for not being compensated adequately by his employer. The UC asked LEAL-PARRA if he had a crew that would be interested in committing a robbery upon his employer. LEAL-PARRA openly expressed his willingness to commit the robbery and informed the UC that he and his crew knew what they were doing and would be interested in committing the robbery. LEAL-PARRA impressed upon the UC that he could "do the job." LEAL-PARRA further told the UC that he could bring two other guys to do the robbery. The UC informed LEAL-PARRA that they would be stealing twenty or more kilograms of cocaine from a "stash house," after the UC made the delivery. The UC advised LEAL-PARRA that they could discuss the details of the robbery for the narcotics at a later date. At the conclusion of the meeting, plans were made for a second meeting.

4. On January 23, 2009, at approximately 12:42 pm, a second meeting was held between the UC, the CS and LEAL-PARRA in a parking lot in Miami-Dade County, Florida. During this meeting, LEAL-PARRA introduced the UC to another Latin male, later identified as Reinaldo LOPEZ. Again, the UC portrayed himself as a disgruntled drug courier and expressed dissatisfaction for not being compensated adequately by his employer. The UC told LEAL-PARRA and LOPEZ that twenty-two kilograms of cocaine would be arriving at the Miami International Airport in the near future and advised that his job was to deliver the narcotics to the "stash house." The CS, the UC, LOPEZ and LEAL-PARRA again discussed robbing the "stash house" of the narcotics after the UC made the delivery. LEAL-PARRA advised the UC that as soon as the UC calls with the

information regarding the arrival of the narcotics, LEAL-PARRA and others would be ready to commit the robbery. During this meeting, LEAL-PARRA and LOPEZ wanted to know if the people inside the "stash house" would be armed with firearms. The UC informed LEAL-PARRA and LOPEZ that there are normally three individuals inside the "stash house" and usually one is armed. LEAL-PARRA and LOPEZ advised that the element of surprise is important when they arrive at the stash house, and LOPEZ further advised that the best way to do the robbery is by entering immediately behind the UC. During this meeting, LEAL-PARRA inquired of the UC how the narcotics would be split. The UC stated that because LEAL-PARRA, LOPEZ, and others, were taking the risk, they should tell him, the UC, how they wanted it divided. LEAL-PARRA then advised that they would split the narcotics in equal parts and everyone present agreed. The UC advised that he would notify LEAL-PARRA three days in advance of the arrival of the narcotics so they could be ready. LEAL-PARRA and LOPEZ advised that they would be ready to commit the robbery as soon as they were notified. At the conclusion of the meeting, the UC, LEAL-PARRA, LOPEZ, and the UC agreed to stay in touch. This meeting was audio and video recorded.

5. On January 23, 2009, at approximately 7:30 pm, the CS and LEAL-PARRA engaged in a series of recorded telephone calls regarding the pending armed robbery of the "stash house." LEAL-PARRA advised the CS that the individuals at that "stash house" are going to be surprised when he and his associates arrive to commit the robbery dressed as "police officers."

6. On February 5, 2009, at approximately 6:27 pm, a third meeting was held between LEAL-PARRA, LOPEZ, the CS, the UC, and a third Latin male, later identified as Osniel RIVERO, at a parking lot in Miami-Dade County, Florida. During this meeting, the UC again portrayed himself as a disgruntled drug courier and spoke of the twenty-five kilograms of cocaine that would be arriving at the Miami International Airport; LEAL-PARRA, LOPEZ, RIVERO, the CS, and the UC again discussed the robbery. Upon hearing the plan, RIVERO advised the UC that they instead wanted to kidnap the UC when he had the narcotics and place a call to the owners of the narcotics demanding a ransom for the release of the narcotics and the UC. The UC advised that he was responsible for the narcotics until it was delivered and he did not think that the alternative plan would work. LEAL-PARRA, LOPEZ and RIVERO then agreed to the original plan of robbing the "stash house" after the deliver was made. RIVERO then advised the UC that when the UC arrives at the "stash house," they will drive up with flashing police lights, dressed as undercover police officers, and take down the occupants of the "stash house." RIVERO, LEAL-PARRA, LOPEZ, and the UC agreed to stay in touch. This meeting was audio and video recorded. When the meeting ended, RIVERO, LEAL-PARRA and LOPEZ met up with two additional subjects later identified as Javier RODRIGUEZ and Luis ROMERO.

7. On February 6, 2009, at approximately 7:04 pm, the CS contacted LEAL-PARRA and they agreed to meet in the area of NW 36th Street and NW 79th Avenue, Miami, Florida. At approximately 7:28 pm, RIVERO, LEAL-PARRA, LOPEZ, RODRIGUEZ and ROMERO arrived at the designated location; at that time, LEAL-

2

PARRA and LOPEZ met with the CS. During the meeting, LOPEZ advised the CS that he had a firearm with him; LEAL-PARRA advised the CS that they all were armed with firearms. LEAL-PARRA and LOPEZ agreed to follow the CS to the UC's office so that they could follow the UC while he retrieved and delivered the narcotics. At approximately 7:30 pm, all departed the designated location for the UC's office; LEAL-PARRA and LOPEZ followed the CS in a 2005 gold Nissan Altima, and RODRIGUEZ, ROMERO and RIVERO followed in a 2000 red Ford Taurus.

8. At approximately 7:36 pm, upon arriving at the UC's office, police officers made their presence known and arrested LEAL-PARRA, LOPEZ, RIVERO, RODRIGUEZ and ROMERO. At the time of arrest, LEAL-PARRA, LOPEZ, RIVERO, RODRIGUEZ, and ROMERO were all wearing black shirts with "POLICE" printed on the front and back. Additionally, LEAL-PARRA was found in possession of a two-way radio, set to channel #6, and one pair of brown cotton gloves. LOPEZ was found in possession of a Smith &Wesson Model 6904 .9mm pistol—loaded with 11 rounds of ammunition, a black holster; and one pair of gloves.

9. A search of the 2005 red Nissan Altima, in which LEAL-PARRA had been the driver and LOPEZ the front passenger, yielded five pairs of flex cuffs located on the front passenger floor, a blue and red strobe light on the driver's visor, and a large black duffle bag in the trunk.

10. A search of the 2000 red Ford Taurus, in which RIVERO had been driving, ROMERO the front passenger, and RODRIGUEZ the right rear passenger, yielded the following from under the center arm rest: a CZ Model 75 .9mm pistol, loaded with 10 rounds of ammunition; one pair of gloves; and one role of tape. Additionally, police discovered one two-way radio, set to channel #6, in the front seat center storage tray, and a taser under the front passenger seat. In the rear pocket of the front passenger seat, police discovered a Walther P99 .9mm pistol, loaded with 14 rounds of ammunition. The Walther was later discovered to have been reported stolen in 2003. Furthermore, police found a cell phone belonging to RODRIGUEZ in the rear passenger door pocket and two pairs of gloves of the floor.

11. RIVERO and RODRIGUEZ were placed into a marked police vehicle with a recording device. RIVERO and RODRIGUEZ talked about how they did not get to commit the robbery, but they did get caught dressed as police officers. RODRIGUEZ stated that gun he brought was "legit" as he paid $50.00 for it.

12. LEAL-PARRA, LOPEZ, and ROMERO were placed into a second marked police vehicle with a recording device. LEAL-PARRA, LOPEZ, and ROMERO talked about getting caught with the firearms and all "that stuff," and how they were facing a couple of years' imprisonment. LOPEZ suggested that they should kill the CS. LEAL-PARRA stated that when he is released from prison, the CS better "disappear." LEAL-PARRA further indicated that he would kill the CS' mother. LEAL-PARRA and ROMERO advised that they were caught with the guns, but the guns were in the car. LOPEZ stated that police caught him wearing his gun and even took a picture of him

wearing his holster. LEAL-PARRA, LOPEZ, and ROMERO discussed how the authorities could not "get" them for kidnapping, robbery, or drugs, but only for possessing police lights and police shirts.

13. Therefore, based on the foregoing, your affiant respectfully submits that Fernando LEAL-PARRA, Reinaldo LOPEZ, Osniel RIVERO, Javier RODRIGUEZ, and Luis ROMERO did knowingly and intentionally conspire to possess with the intent to distribute a controlled substance, that is, a mixture and substance containing 5 kilograms or more of cocaine, in violation of Title 21, United States Code, Section 841(a)(1), all in violation of Title 21, United States Code, Section 846; did knowingly and intentionally conspire to obstruct, delay or affect interstate commerce or the movement of any article or commodity in commerce, by robbery, in violation of Title 18, United States Code, Section 1951(a), and did knowingly and intentionally possess a firearm in furtherance of a drug trafficking crime and/or a crime of violence, in violation of 18 United States Code, Section 924(c)(1)(A).

**FURTHER AFFIANT SAYETH NAUGHT**

_____
VIRGILIO VALDES, DETECTIVE
MIAMI-DADE POLICE DEPARTMENT
ATF/HIDTA TASK FORCE

Subscribed and sworn to before me
this 7th day of FEBRUARY 2009

_____
WILLIAM C. TURNOFF
UNITED STATES MAGISTRATE JUDGE

4